901 P.2d 779

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Arthur NIEWIADOWSKI,
Defendant–Appellant.**

No. 15375.

Court of Appeals of New Mexico.

June 29, 1995.

Certiorari Denied Aug. 14, 1995.

Tom Udall, Attorney General, Max Shepherd, Asst. Attorney General, Santa Fe, for plaintiff-appellee.

Sammy J. Quintana, Chief Public Defender, Rita LaLumia, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

## OPINION

PICKARD, Judge.

This appeal from Defendant's convictions for second degree murder and attempted murder provides us with yet another opportunity to consider the admissibility of evidence of other bad acts under SCRA 1986, 11-404(B) (Repl.1994). Defendant raises the following issues: (1) admission of evidence of prior bad acts; (2) denial of motion for mistrial based on the prosecutor's comments concerning Defendant's plea to a prior offense; (3) admission of Defendant's statement to the police; (4) refusal to instruct the jury on defense of habitation; and (5) cumulative error. Our analysis will focus principally on the first issue. We affirm.

*Facts*

Defendant met Lorraine Garza in 1986. During the next six years Defendant and Lorraine had friendly conversations when they encountered each other. In January 1992, Lorraine saw Defendant at a fast-food restaurant, and she asked him for a ride home. At that time Lorraine was living with her boyfriend Dwayne Krien, Dwayne's friend Shawn Kirby, and Lorraine's extended family. Defendant began to call Lorraine's house daily and, as a result, Dwayne and Shawn became angry. Eventually, Lorraine told Defendant not to call anymore because it was making Dwayne upset.

On the evening of January 20, 1992, Defendant called Lorraine and asked if Dwayne was at home. Lorraine said that Dwayne was present. Ten minutes later Defendant and a friend of his drove up to Lorraine's house. Lorraine went outside to talk to De-

fendant, and she told him to leave. Defendant drove off, turned around, and parked in the middle of the street. Dwayne and Shawn came out of the house and walked toward Defendant's car. Lorraine ran past Dwayne and Shawn, and she again told Defendant to leave. He said, "Okay."

As Lorraine turned back to her house, she heard bullets going by. Shawn and another person who witnessed the incident testified that the shots came from Defendant's car. The police found six bullet casings in the street near where Defendant's car had been parked.

Krista Thorson was also present at Lorraine's house during the incident. She testified that Defendant called the house immediately after the shooting and asked if he had hit anyone. When Defendant was told that no one had been struck, he said, "Darn." At school, Defendant told Krista to tell Dwayne to "watch his back, he's going to die." Defendant also called Lorraine's house and repeated his threat.

On January 29, 1992, around lunch time, Defendant was at his family's apartment getting ready to go to school. Shawn and Dwayne, traveling in separate vehicles, went to Defendant's apartment complex. After Shawn spotted Defendant's car, he told Dwayne that he was going to confront Defendant at his apartment. Defendant walked out of his apartment as Shawn approached. Shawn questioned Defendant about the January 20th shooting incident, and Defendant responded, "Shit happens." Shawn punched Defendant in the nose. Shawn also bloodied Defendant's ear, knocked off his eyeglasses and cap, and kicked him in the stomach. Defendant threw off his jacket during the scuffle.

Defendant's sister came out of the apartment and broke up the fight. Dwayne approached and said, "Let's get out of here." Shawn and Dwayne walked away from the scene, and Shawn picked up Defendant's jacket and cap. Defendant's sister testified that Defendant went into their apartment, came back out, got a gun from his car, and shot in the direction of Shawn and Dwayne as they crossed the street. Other witnesses testified that Defendant shot at Dwayne and

Shawn without hesitation, that Dwayne fell, and that Shawn then started shooting at Defendant. Dwayne was struck by a bullet in the back, and he died later that day.

Defendant's account of the January 29th incident, according to the statement he gave the police, differed in the following important respects. Defendant saw a gun in Dwayne's waistband while he fought with Shawn. After the fight ended, Defendant got a gun from his car, and he fired several warning shots into the air in an attempt to get Dwayne and Shawn to return his jacket and cap. Shawn fired a shot at Defendant, and Defendant started shooting back.

### Evidence of Defendant's Prior Bad Acts

Defendant was tried on an open count of murder of Dwayne and the attempted first degree murder of Shawn. Prior to trial, the State successfully moved for permission to introduce evidence of Defendant's prior misconduct to show his intent to kill Dwayne and Shawn. *Cf. State v. Lucero*, 114 N.M. 489, 492, 840 P.2d 1255, 1258 (Ct.App.) (where objection is raised, counsel is required to identify the consequential fact to which the proffered evidence of prior bad acts is directed), *cert. denied*, 114 N.M. 413, 839 P.2d 623 (1992). Defendant contends that the evidence of his role in the January 20th shooting was improperly admitted under SCRA 1986, 11–403 and –404(B) (Repl.1994). We disagree.

■ We begin our analysis mindful that SCRA 11–404(B) operates generally to exclude other-bad-acts evidence because of its large potential for prejudice. *State v. Jones*, 120 N.M. 185, 187, 899 P.2d 1139, 1141 (Ct. App.1995). Defendant describes the evidence of his prior conduct as "character" evidence. This description begs the question of the probative value of the evidence. To the extent that the evidence served to prove only that Defendant acted in conformity with his alleged propensity for violence, it is inadmissible character evidence. *See id.* at 188, 899 P.2d at 1142. On the other hand, evidence of Defendant's other bad acts can be admissible if it bears on a matter in issue, such as intent, in a way that does not merely

show propensity. *See id.* at 188–189, 899 P.2d at 1142–43.

■ Defendant's intent to kill Dwayne and Shawn is subject to proof under SCRA 11–404(B) only if Defendant's intent was controverted and thus became a consequential issue in the case. *See State v. Beachum,* 96 N.M. 566, 568, 632 P.2d 1204, 1206 (Ct.App.1981); *see also State v. Lamure,* 115 N.M. 61, 70, 846 P.2d 1070, 1079 (Ct.App.1992) (Hartz, J., specially concurring) (intent exception limited to cases in which the issue is seriously disputed), *cert. denied,* 114 N.M. 720, 845 P.2d 814 (1993). Defendant contends that the evidence of his prior misconduct does not relate to an element of the crimes charged and that he did not place his intent to kill in issue. We disagree for the following reasons.

■ First, in order for the jury to find Defendant guilty of first degree murder of Dwayne, the State was required to prove beyond a reasonable doubt that Defendant acted with the deliberate intention to take away Dwayne's life. *See* SCRA 1986, 14–201 (essential elements of first degree murder; deliberate intention refers to the state of mind of the defendant). Second, Defendant's claims of provocation, self-defense, and defense of another placed the matter of his intent squarely in issue. *See* SCRA 14–201 ("mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill"); SCRA 1986, 14–222 (sufficient provocation affects ability to reason and causes a temporary loss of self control); *State v. Chavez,* 99 N.M. 609, 611, 661 P.2d 887, 889 (1983) (self-defense instruction requires evidence to support a finding that the defendant was put in fear, that the killing resulted from that fear, and that the defendant acted as a reasonable person would have under the circumstances); *State v. Venegas,* 96 N.M. 61, 62, 628 P.2d 306, 307 (1981) (finding of justifiable homicide in defense of another requires substantial evidence that the defendant reasonably believed his actions were necessary to prevent an apparent immediate danger to another). That Defendant did not offer evidence of the prior incident to prove his knowledge of Dwayne's propensity for violence and thus support Defendant's claim that he shot Dwayne in self-defense, *cf.* SCRA 11–404(A)(2) (evidence of character of victim offered by an accused), does not alter the fact that Defendant placed his own intent in issue simply by maintaining that he acted in self-defense.

Defendant claims that since Dwayne and Shawn were the aggressors on January 29th, evidence pertaining to the January 20th incident does not demonstrate that Defendant had the deliberate intent on the later date to murder either Dwayne or Shawn. To the contrary, Defendant's claim of self-defense presented the jury squarely with the duty to determine whether Defendant shot at Dwayne and Shawn because they were aggressors, SCRA 1986, 14–5183 (Element 2), or because of his own private motive evidenced by the January 20th incident. *See State v. Mireles,* 119 N.M. 595, 597, 893 P.2d 491, 493 (Ct.App.1995) (evidence of feud between two families was relevant to show motive); *State v. Garcia,* 99 N.M. 771, 775–76, 664 P.2d 969, 973–74 (evidence of gang membership and prior insults was relevant to show motive), *cert. denied,* 462 U.S. 1112, 103 S.Ct. 2464, 77 L.Ed.2d 1341 (1983); *cf. State v. Delgado,* 112 N.M. 335, 341, 815 P.2d 631, 637 (Ct.App.) (sex-crime defendant's feelings of lust toward a particular person is admissible under SCRA 11–404(B) as showing disposition, or motive, toward that person), *cert. denied,* 112 N.M. 220, 813 P.2d 1018 (1991).

■ The following evidence of the January 20th incident permits the reasonable inference that Defendant deliberately intended to take away Dwayne's life on January 29th: (a) Defendant shot at Dwayne and Shawn when they walked towards Defendant's car on January 20th; (b) Defendant expressed disappointment upon learning that he had not hit anyone; and (c) Defendant threatened that Dwayne would die. *See Dull v. Tellez,* 83 N.M. 126, 128, 489 P.2d 406, 408 (Ct.App. 1971) ("reasonable inference" defined). Since Defendant's specific intent was at issue and because the evidence of his prior bad acts bears on that intent in a way that does not merely show his propensity for violence,

the evidence is not barred by SCRA 11–404(B). *See Jones,* at 187, 899 P.2d at 1141.

■ The remaining question is whether the probative value of the evidence of Defendant's prior bad acts was substantially outweighed by its prejudicial effect. *See id.* at 190, 899 P.2d at 1144; SCRA 11–403. Other than evidence relating to Defendant's conduct pertaining to the January 20th incident, there was little, if any, evidence that he carefully thought and weighed the considerations for and against killing Dwayne. *See State v. Fuson,* 91 N.M. 366, 368, 574 P.2d 290, 292 (Ct.App.1978) (a factor in considering probative value is the availability of other means of proof); *cf.* SCRA 14–201 ("deliberate" defined). In addition, we are not persuaded that the jury's determination that Defendant committed second degree murder demonstrates that the prior bad acts evidence was unfairly prejudicial.

In sum, we hold that the trial court did not abuse its discretion in admitting evidence of Defendant's bad conduct prior to the date of the homicide. *See State v. Altgilbers,* 109 N.M. 453, 471, 786 P.2d 680, 698 (Ct.App. 1989) (standard of review), *cert. denied,* 109 N.M. 419, 785 P.2d 1038 (1990).

*Prosecutor's Comment During Opening Statement*

During the prosecutor's opening statement he told the jurors that they were going to hear evidence that Defendant pled "guilty" to the January 20th shooting. Defense counsel objected and announced that "Defendant never pled guilty." During the bench conference that ensued, counsel objected to the prosecutor's statement on the grounds that Defendant pled "no contest," and he moved for a mistrial. The trial court denied the motion. The judge stated her belief that the jury would be able to disregard the statement, made very early in the trial, and she instructed the jury to do so.

Defendant suggests that the trial court could have cured the error with the combination of a correction and an explanation of the differences between the two types of pleas. At trial however, defense counsel stated his belief that a correction would not be helpful.

*Cf. State v. Rivera,* 115 N.M. 424, 429, 853 P.2d 126, 131 (Ct.App.) (failure to request an instruction limiting the jury's consideration of evidence to the purpose for which it was admitted constitutes a waiver of error), *cert. denied,* 115 N.M. 228, 849 P.2d 371 (1993).

■ The record reflects that the prosecutor's statement and the defense's denial during opening statement was the only reference to legal proceedings connected with the shooting on January 20th; there was no evidence that Defendant was charged with or entered a plea with respect to that event. Both the State and Defendant introduced evidence for the jury's consideration pertaining to Defendant's role in the incident. Consistent with the instruction to the jury to disregard the statement regarding Defendant's plea, the jury was free to conclude, as Defendant sought to prove, that he only shot at Dwayne and Shawn on January 20th after they shot at Defendant's car. Nothing suggests to us that the trial court erred with respect to its appraisal of the impact of the prosecutor's statement on the fairness of the trial. *See State v. Reynolds,* 111 N.M. 263, 266, 804 P.2d 1082, 1085 (Ct.App.1990) (standard of review), *cert. denied,* 111 N.M. 164, 803 P.2d 253 (1991).

*Defendant's Statement to the Police*

Defendant moved to suppress a statement he made to a detective on the evening of the fatal shooting on the grounds that he did not knowingly and intelligently waive his constitutional rights. The thrust of Defendant's argument and supporting evidence was that his father, a Polish immigrant who was present when the statement was given, was incapable of understanding Defendant's constitutional rights because of the father's limited familiarity with the English language and our judicial system. Defendant also contended that his own age rendered him incapable of waiving his constitutional rights.

■ The interview took place several weeks before Defendant's seventeenth birthday. Defendant was a high school student, and he had attended public schools in the United States for eight years. Defendant turned himself in before the interview began and was in police custody. The interview took place in a police department conference

room beginning at 7:39 p.m. and ending at 8:08 p.m. Defendant, his father, and the detective were present. The detective testified that Defendant was calm and presented himself in a normal fashion. Using the department's juvenile advice of rights form, the detective advised Defendant of his rights while Defendant had a copy of the form in front of him. Defendant stated that he read and understood English, and he signed a form indicating that he understood his rights. The detective testified that he did not use threats, physical abuse, or coercion during the interview. Defendant's father is a naturalized United States citizen, and he and Defendant had an opportunity to converse in Polish during the interview. While Defendant's father's English language skills and comprehension may have been limited, an issue on which the evidence conflicted, there is nothing to suggest that those limitations contributed to a coercive interview.

Defendant urges that we consider the factors listed in NMSA 1978, Section 32A–2–14(E) (Repl.Pamp.1993) (basic rights of child subject to provisions of the Children's Code) to determine whether he knowingly, intelligently, and voluntarily waived his rights. We assume without deciding that Children's Code statute is applicable under the circumstances of this case where jurisdiction was transferred to the district court. Considering those factors and the pertinent evidence, we conclude that Defendant's statement was knowingly, intelligently, and voluntarily given. *See Aguilar v. State*, 106 N.M. 798, 799–800, 751 P.2d 178, 179–80 (1988) (de novo review); *see also State v. Jonathan M.*, 109 N.M. 789, 791, 791 P.2d 64, 66 (1990) (child over age fifteen is unlikely to make an involuntary statement in a noncoercive atmosphere or after receiving *Miranda* warnings).

### Defense of Habitation

Defendant tendered an instruction based on SCRA 1986, 14–5170 (justifiable homicide; defense of habitation). Defendant argues that he was entitled to the instruction because the initial attack took place in the "curtilage" of his home and he could have reasonably believed that Shawn and Dwayne had come back to further assault or kill him or his sister or to rob him further of other possessions. *See generally State v. Sutton*, 112 N.M. 449, 452, 816 P.2d 518, 521 (Ct. App.) (curtilage for Fourth Amendment purposes is the enclosed space of grounds and buildings immediately surrounding a dwelling home), *cert. denied*, 112 N.M. 308, 815 P.2d 161 (1991). We reject this claim.

The fight between Shawn and Defendant took place in the parking lot in front of Defendant's apartment. Shawn testified that he came back to pick up Defendant's hat and jacket in the parking lot before he reached the street. According to Defendant, Dwayne and Shawn were running across the street away from Defendant when he fired four warning rounds and demanded that his jacket be returned or he would shoot. Shawn turned and fired after he was across the street, and then Defendant shot at Dwayne and Shawn as they ran away from Defendant, up a hill across the street from the parking lot. Neither this evidence nor any other evidence in the record supports the inference necessary to support the requested instruction, that Defendant killed Dwayne while attempting to prevent an armed robbery or aggravated assault in Defendant's home. Accordingly, we hold that it was not error to deny Defendant's request. *See State v. Cavanaugh*, 116 N.M. 826, 830, 867 P.2d 1208, 1212 (Ct.App.1993) (defendant entitled to jury instruction that supports his theory of the defense only if the instruction is supported by the evidence), *cert. denied*, 117 N.M. 121, 869 P.2d 820 (1994).

### Cumulative Error

Defendant contends that the cumulative effect of errors deprived him of a fair trial. Since we have concluded there was no error, there is no basis for Defendant's claim of cumulative error. *See State v. Larson*, 107 N.M. 85, 86, 752 P.2d 1101, 1102 (Ct.App.), *cert. denied*, 107 N.M. 74, 752 P.2d 789 (1988).

We affirm.

IT IS SO ORDERED.

DONNELLY and ALARID, JJ., concur.